[Cite as *Martin v. Toledo Clinic, Inc.*, 2025-Ohio-2619.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Marilyn Martin

Court of Appeals No.  L-24-1276

Appellant

Trial Court No.  CI0202203892

v.

Toledo Clinic, Inc., et al.

**DECISION AND JUDGMENT**

Appellees

Decided:  July 25, 2025

* * * * *

Kyle A. Silvers, for appellant.

Elizabeth E. Baer and Charles E. Hatch, for appellees.

* * * * *

**MAYLE, J.**

**{¶ 1}** Plaintiff-appellant, Marilyn Martin, appeals the November 12, 2024 judgment of the Lucas County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Van Boggus, M.D., Toledo Clinic, Inc., Jason Tank, M.D., and ProMedica Central Physicians.  For the following reasons, we affirm, in part, and reverse, in part.

# I. Background

{¶ 2} Patricia Halter was the original plaintiff in this case. She filed an action for medical malpractice on September 28, 2022, against orthopedic surgeons Van Boggus, M.D. and Jason Tank, M.D., and their employers, Toledo Clinic, Inc. and ProMedica Central Physicians, respectively. After being appointed Halter's guardian, Martin was substituted as plaintiff on December 13, 2023.

{¶ 3} The parties exchanged discovery, identified expert witnesses, and conducted depositions. Halter, Martin, Dr. Boggus, and Dr. Tank testified to the facts of the case. There are discrepancies—some significant—in their recollection of the facts. There are also discrepancies between Dr. Boggus's testimony and what he charted in the medical records.

{¶ 4} Unfortunately, neither Halter's deposition nor the medical records are contained in the trial-court record.[1] We are mindful that under Civ.R. 56(E), "an adverse party may not rest upon the mere allegations or denials of the party's pleadings," however, in summarizing the parties' factual positions below, we will recite the allegations in Halter's complaint because they provide context for the topics explored in the other witnesses' deposition testimony.

{¶ 5} In addition to these fact witnesses, expert depositions were taken. We will summarize the experts' testimony only to the extent necessary to resolve the issues on

---

[1] Dr. Boggus sought to file deposition exhibits under seal. Martin objected, and the trial court denied the motion. There is no indication that the exhibits were ever filed at all.

2.

appeal. Where representations have been made at the doctors' depositions concerning the content of the medical records, we will accept that those representations are accurate unless the context or testimony indicates otherwise.

## A. Halter's Allegations as Set Forth in the Complaint

{¶ 6} Briefly stated, Halter's complaint alleges that she sustained an injury to her left leg on June 24, 2021. She presented to the Flower Hospital emergency department ("ED") two days later, at which time x-rays showed that she had suffered a nondisplaced fracture of her left tibia. Her leg was placed in a splint and she was advised to follow up with orthopedic surgeon, Dr. Boggus.

{¶ 7} Halter saw Dr. Boggus on June 30, 2021. He placed her in a short walking cast[2] and told her to follow up in four weeks. In the meantime, however, on July 13, 2021, Halter presented to Toledo Hospital ED with shortness of breath. She was diagnosed with bilateral pulmonary emboli, complete arterial occlusion from deep vein thrombosis, and compartment syndrome in her right leg. She was admitted to the intensive care unit and underwent multiple procedures including a thrombectomy and fasciotomies. X-rays showed a new oblique fracture of her distal fibula and a spiral tibial fracture. Halter alleged that Dr. Boggus noted her new fracture but did not address weight-bearing status, did not offer surgery, and did not remove the cast to check her skin.

---

[2] This fact is disputed, but will be discussed later in this decision.

3.

{¶ 8} On July 19, 2021, Halter sought a second opinion from Dr. Tank. He replaced her short walking cast with a long leg cast.[3] On August 12, 2021, he replaced the cast with a CAM boot. Halter developed an open infected wound on her ankle. She saw Dr. Tank on September 23, 2021, and he ordered an MRI and lab tests, but did not otherwise treat the wound. Halter's leg pain intensified and she again presented to the Toledo Hospital ED. She was diagnosed with osteomyelitis of her left tibia and fibula and significant varus deformity. Dr. Tank performed a series of irrigation and debridement procedures and placed antibiotic beads to try to salvage the leg, but Halter underwent a below-the-knee amputation of her left leg on October 6, 2021.

{¶ 9} Halter alleged that Drs. Boggus and Tank failed to act with reasonable skill, care, and diligence by failing to properly evaluate and treat her condition; order necessary testing and prescribe necessary medications; appreciate the severity of her medical condition; and consult with other physicians. She maintains that their negligence proximately caused her to suffer amputation of her leg.

## B. Martin

{¶ 10} Martin testified that she was living with Halter in June of 2021, and was home when Halter fell. When Halter finally agreed to go to the Flower Hospital ED two days after her fall, her foot was swollen. X-rays performed at the ED showed that her leg was broken. Her leg was placed in a cast or splint and was wrapped in a material that

---

[3] It is disputed that Dr. Tank placed Halter in a long leg cast.

4.

turned to plaster. She was instructed to see an orthopedic surgeon and not to bear weight on her leg. To get around, Halter used a walker and hopped.

{¶ 11} Martin went with Halter to see Dr. Boggus on June 30, 2021. Martin wheeled Halter in in a wheelchair. Dr. Boggus told Halter and Martin that it was "a perfect break" and had his nurse put Halter in a walking cast. They were instructed to go to the medical supply store to get a shoe or sandal to put over the cast so she could walk on it, and a follow-up appointment was scheduled. Martin could not recall how soon Dr. Boggus said that Halter could walk on her left leg, but she thought he said immediately. They went directly to the medical supply store with the prescription for the cast shoe. They were given no written instructions about how or when to use the cast shoe.

{¶ 12} Halter tried to use the cast shoe a couple of times, but it was too painful. She mainly stayed off her foot and used the walker and hopped when she needed to use the bathroom. Halter was getting ready to move, so she was slowly packing her belongings. "Her activity was limited but not nonexistent."

{¶ 13} Although she did not know this right away, Martin learned that Halter called Dr. Boggus's office on July 7, 2021, and was told to go to the ED because it sounded like she had a pulmonary embolism. By approximately July 10, 2021, Halter was having breathing problems to the point that it sounded like she was wheezing. She continued to complain of pain in her left leg. She was transported to Toledo Hospital by ambulance on July 13, 2021.

5.

{¶ 14} Martin testified that in the ED, x-rays showed that Halter's tibia had moved and now her fibula was broken and her heel was damaged. Halter was asked whether she had been walking on her left leg and she said that she had been because Dr. Boggus said it was a walking cast. An ED employee commented that she knew Dr. Boggus and did not think that he would say that she could walk on it. Halter was prepped for additional testing, and Martin left the hospital. As she got home, she received a call that Halter had just come out of surgery.

{¶ 15} Martin visited Halter most days when she was in the hospital, but she mainly visited at night and spoke to nurses, but not doctors. At some point, someone at the hospital said that the fracture caused Halter to develop clots or DVTs.

{¶ 16} Eventually, Dr. Tank placed Halter in a boot. Halter told Martin that she was told not to remove the boot and to treat it like a cast. She said that she had to wrap it in plastic in order to shower. Halter wore the boot 100 percent of the time until the last day when she took it off and found a hole in her left ankle. Martin said her foot looked awful—twisted and swollen—and Halter was crying. They called Dr. Tank's office and were told to leave the boot off until her appointment with Dr. Tank.

{¶ 17} Halter decided to have her leg amputated. She did not consult Martin in making this decision. Halter recounted that Dr. Tank said that he could possibly get her walking within three years, but with an amputation, she could be walking within one or two months. Dr. Afridi, a vascular surgeon, told Martin that Halter had made the right decision because the leg was lifeless.

6.

## C. Dr. Boggus

{¶ 18} Dr. Boggus did not independently recall his encounter with Halter. Nevertheless, he testified that Halter came to him wearing a short leg posterior splint, which someone in his office "circularized with a roll of fiberglass." This is contrary to his chart, which indicates that Halter was placed in a walking cast. Although not charted, Dr. Boggus testified that he instructed Halter to remain non-weight-bearing.

{¶ 19} Dr. Boggus was asked about other discrepancies between his chart and his testimony. Despite a note in Halter's chart indicating that she is allergic to Norco, Dr. Boggus testified that he prescribed Norco because Halter asked for it. The chart states that Halter was "ambulating in a wheelchair," but Dr. Boggus testified that this was a typographical error. Dr. Boggus testified that Halter had normal circulation, but this was not charted. There is nothing in the record demonstrating the presence or absence of lower extremity pulses "[b]ecause it wasn't typed in." It was charted that Halter's fracture was "healing well," but Dr. Boggus testified that this too was a typographical error and should have said that she "will heal well."

{¶ 20} Dr. Boggus did not ask Halter about prior fractures. He did not know that she had a brain lesion in 2007, and a history of tremors, gait disorder, dizziness, pulmonary emboli and DVTs, splenectomy, and diabetes. He did not perform an additional x-ray because he does not have a machine in his office. Dr. Boggus said he would have scheduled Halter for another x-ray, but there is no such order in the chart. Dr. Boggus did not know that Halter's fall occurred two days before she sought treatment.

7.

He did not consider the potential of peripheral artery disease despite Halter's history of diabetes and smoking, and the chart does not indicate that he advised her to follow up with a vascular specialist.

{¶ 21} Dr. Boggus acknowledged that Halter presented to Toledo Hospital on July 13, 2021, with extensive acute pulmonary embolism with RV strain, right popliteal artery occlusion, a "new" spiral fracture of the horizontal transverse tibia—"new in that it was now angulated"—and a "now displaced fibula fracture," which may have been there before and was nondisplaced, but had become angulated and displaced. He conceded that weightbearing could have caused the angulation and additional fracture. Dr. Boggus said that bearing weight would have been against medical advice, but admitted that this advice was not charted. He claimed that he directly discussed this advice with Halter, but there is no documentation of the discussion. He denied that he instructed Halter that it was a walking cast and that he sent her to get a cast shoe so that weight could be placed on the cast.

{¶ 22} A physician's assistant who operates under Dr. Boggus's management charted on July 13, 2021, that Halter had a short-leg fiberglass cast. Dr. Boggus said this note was inaccurate, but he too repeatedly charted that she was wearing a short-leg cast and that she should continue with the cast. The PA also charted "normal neurovascular" and "normal upper and lower extremity." Dr. Boggus conceded that a lower extremity examination would not have been normal.

8.

{¶ 23} Dr. Boggus explained that the angulation could be treated non-surgically or surgically. He preferred to treat it surgically once Halter was medically cleared, but he acknowledged that Halter was a high-risk patient. Dr. Boggus testified that Halter told him that she wanted to move forward with surgery, however, he acknowledged that he did not know if Halter was intubated when he discussed surgery with her; the chart suggests that she was. He conceded that he did not examine Halter's skin when he saw her on July 14, 2021. He charted that she did not have compartment syndrome because there was no pain on passive stretch of her toes.

{¶ 24} Dr. Boggus maintained that his treatment of Halter and his charting complied with the standard of care.

## D. Dr. Tank

{¶ 25} Dr. Tank testified that his PA saw Halter on July 19, 2021, and he saw her the following day. Halter had requested a second opinion for treatment of her tibia fracture. At that point, Halter had a distal third tibia shaft fracture with approximately 12 degrees of varus of her lower left extremity. She had had a contralateral arterial occlusion requiring surgical intervention and fasciotomies. She also had bilateral pulmonary emboli and other comorbidities. He considered her high-risk.

{¶ 26} According to the chart, when the PA saw Halter, she was in a cast. When he saw her, she was in a splint. Dr. Tank distinguished a splint from a cast. He said that a cast is circumferentially wrapped around the leg and is made of plaster or fiberglass. When Dr. Tank examined Halter, there were no wounds on her skin.

9.

{¶ 27} Dr. Tank explained to Halter that they could manage her injury non-surgically or surgically. The day he saw her, he took her out of the splint and placed her in a cast with instructions not to bear weight on the extremity. He charted that "she was initially managed non-surgically in a cast that she was walking on that has resulted in this deformity." At deposition, however, he would say only that the deformity "could have" emanated from bearing weight on the extremity. He said the same was true for the additional fracture that was diagnosed. Dr. Tank charted that given her recent revascularization and fasciotomies, her "high intensity Heparin drip," and her chronic comorbidities, including neuropathy of unknown etiology, "managing this one-month old tibia fracture with varus deformity is significantly high risk." Specifically, Halter was at risk for bleeding and infection. Dr. Tank believed it was appropriate to manage the injury non-surgically rather than surgically. After a long discussion with Halter, they decided to proceed conservatively. He told her to follow up in three weeks.

{¶ 28} Dr. Tank saw Halter again in his office on August 12, 2021. She was first seen by a resident. They continued to believe that it was best to treat Halter non-surgically, however, it was explained that she may have some residual deformity that may require surgery. Halter was transitioned to a CAM boot and instructed to remain non-weight-bearing. A company located in his office placed the CAM boot and would have shown Halter how to take it on and off and care for it. He did not know if that company provided written instructions, whether anyone was with Halter at the time, or whether Halter had cognitive deficits.

10.

{¶ 29} On September 21, 2021, Halter called his office and said that she believed her left lower leg was infected. The call was summarized in the chart: "She has a boot on and is not allowed to remove but is in a lot of pain and has swelling." About a half hour later, a PA charted that Halter had called, reporting that she had not taken her CAM boot off since it was placed in August. She took it off that day and found "a large draining wound on the lateral aspect of the ankle." She was scheduled to come in that Thursday, but was offered a same-day appointment. She could not make it that day because she lacked transportation, so she was advised to cover the wound with a dry dressing and keep it clean and dry. She was told to keep the boot off until her follow-up appointment.

{¶ 30} When Halter came to the office on September 23, 2021, both Dr. Tank and a PA saw her. It was charted that she had an open wound over the lateral ankle that probed directly to the bone. There was moderate erythema and concern for underlying infection. Dr. Tank spoke directly with Halter's vascular surgeon, Dr. Sophie Afridi, and charted that they discussed Halter's clinical case and "progressive deformity of her tibia from her prior non-displaced fracture resulting in a soft tissue envelope wound and infection and concern[] for the need for surgery." He continued that "she's also on anti-coagulation which she will likely not be able to come off of all of (sic) due to her prior history of PE and thrombus of her right popliteal artery."

{¶ 31} Dr. Afridi had seen Halter the day before in the wound clinic and started treating the wound. Dr. Tank wanted to discuss with Halter the potential need for surgery due to the progressive deformity and concern for infection. He talked with her about the

11.

potential for a below-the-knee amputation versus multiple staged procedures, communicating to Halter that this was a limb-threatening situation. Halter indicated her understanding that the first step was to clear the infection then manage her soft tissue and osseous deformity, then try to get her tibia to heal. Halter understood that it would be a long process. Dr. Tank ordered lab work and an MRI to evaluate for osteomyelitis and soft tissue involvement. He did not prescribe an antibiotic at that time. He wanted to get cultures first. He considered admitting Halter to the hospital, but she did not appear toxic. He scheduled another appointment for September 27, 2021, where he planned to consider treatment options after getting the labs and MRI results.

{¶ 32} On September 24, 2021, Halter called Dr. Tank's office and communicated that she wanted to discuss amputation. She also wanted stronger pain medication. She was admitted to Toledo Hospital the next day and placed on antibiotics. After her admission to the hospital, she became more tachycardic, had a fever, and had a white blood count of 25 consistent with infection or inflammation. Dr. Tank did not know whether it would have made a difference if he had placed her on antibiotics when he saw her on September 23, 2021.

{¶ 33} Dr. Tank performed irrigation and debridement ("I and D") surgeries on September 27, October 1, and October 4, 2021. Halter's pre-operative diagnosis was left infected tibia fracture with open wound, sepsis, and multiple comorbidities. He debrided the infected tissue down to the bone, irrigated it, placed antibiotic beads, and placed her in an external fixture device to straighten out the deformity and hold her limb more

12.

stably. There was deep purulence. He sent samples of her fibula and tibia for culture. Post-operatively, Halter was diagnosed with osteomyelitis of the left tibia and fibula, status post left ankle fracture with chronic infections.

{¶ 34} Dr. Tank believed Halter's left limb could be salvaged, but it would take multiple surgeries and six months to two years. Halter ultimately opted to have her leg amputated on October 6, 2021. Dr. Tank did not recommend that Halter undergo amputation and, in fact, was disappointed with her decision. He testified that he was observing improvement in her condition following surgery.

{¶ 35} Dr. Tank does not believe that he failed to act as a skilled, careful, and prudent physician in his treatment of Halter, and he has no criticisms of the care provided by anyone else.

### E. Expert Witness Dr. Farzin Kabaei, M.D.

{¶ 36} Dr. Kabaei is an orthopedic surgeon retained by Martin. He opined that (1) Dr. Boggus's charting was not appropriate; (2) Halter experienced a pathological tibia fracture (not a typical traumatic fracture) that should have been treated with a non-weight-bearing splint or cast—not a walking cast; (3) given her history of blood clots, smoking, and diabetes, she should have been treated prophylactically to prevent DVT or blood clots and/or referred to a vascular specialist; (4) Dr. Boggus performed an incomplete physical examination insofar as no neurovascular exam is described in the chart; and (5) upon seeing Halter in the hospital, Dr. Boggus should have removed Halter's cast and examined the skin and soft tissue.

13.

**{¶ 37}** As to the initial fracture being pathological, Dr. Kabaei could not support this opinion to a reasonable degree of medical probability because appropriate tests were not performed. As to Dr. Boggus's failure to remove the cast and examine the soft tissue, Dr. Kabaei conceded that when Dr. Tank removed the cast on July 20, 2021, he did not note any evidence of skin issues, so he could not say that Dr. Boggus's failure altered the course of Halter's care.

**{¶ 38}** As to the failure to prophylactically address Halter's risk for DVTs, Dr. Kabaei testified that "[t]he patient should have been started on DVT prophylaxis on the first visit that she was with [Dr. Boggus], and if he wasn't the one that was going to prescribe the DVT prophylaxis, it was his responsibility to contact either the primary care physician or a colleague or someone who is addressing the fact that she's extremely high risk for blood clots." By the time Dr. Boggus saw Halter in the hospital on July 13, 2021, she had already developed severe blood clots, significantly increasing her chances of further complications. Dr. Kabaei testified that if he would have been consulted on Halter's case, he definitely would have contacted her primary care physician or another physician with more insight into her medical history. Having said all this, Dr. Kabaei could not opine "for certain" that Halter would not have developed DVTs anyway—just that her chances of developing a new clot or propagating an existing one would have decreased. He testified:

> Q: If she had been given DVT prophylaxis on June 30th, in that scenario, while it is possible that DVT, if it existed, would not have propagated, you can't say for certain that that wouldn't have happened regardless; true?

14.

A: Yes.

{¶ 39} When addressing Dr. Boggus's inadequate charting, Dr. Kabaei was asked about instances where Dr. Boggus testified to observations or examinations that either were not documented in the chart or were at odds with the chart. Dr. Kabaei explained his view that "if you don't document your exam . . . it's safe to assume that it didn't happen." When asked if it was his opinion that Dr. Boggus was being untruthful, Dr. Kabaei said "no," and that he didn't "know what [Dr. Boggus] did, because he didn't document anything."

{¶ 40} Dr. Kabaei believes that by the time Halter contacted Dr. Boggus's office on July 6, 2021, complaining of shortness of breath, the blood clot had likely already developed and she likely already had a pulmonary embolism. He said that DVT prophylaxis would have significantly reduced the risk of developing the pulmonary embolism. He could not quantify the risk. He explained that it was not the nondisplaced fracture that caused the risk for DVT—it was her significant medical history and comorbidities combined with the fracture. Dr. Kabaei could not say to a reasonable degree of medical probability when Halter developed the DVT or bilateral pulmonary emboli. He could also not opine as to the cause of the DVTs in the left lower extremity.

{¶ 41} Dr. Kabaei opined that the standard of care required Dr. Boggus to instruct Halter to remain non-weight-bearing. He observed that multiple medical records indicated that she was placed in a walking splint or cast and told that she could bear weight. He acknowledged that Dr. Boggus testified contrarily, but emphasized that the

15.

documentation did not support Dr. Boggus's contention that he instructed Halter not to bear weight.

{¶ 42} To Dr. Kabei's knowledge, Halter was not bed-ridden from June 30 to July 13, 2021. He saw notes indicating that she was walking in a walking cast. Dr. Boggus's notes indicate that there was callus visible on a July 13, 2021 x-ray—which would suggest that the fracture was healing—but from his review of the films, Dr. Kabei disagreed that there had been callus formation.

{¶ 43} Dr. Kabaei agreed that the record indicates that Dr. Boggus discussed performing open reduction and internal fixation on July 20, 2021, but that surgery did not happen. He could not opine whether this surgery would have prevented additional complications from the further progression of her fracture. He explained that Halter's comorbidities made it too hard to predict.

{¶ 44} Dr. Kabei testified that Halter's fracture displaced between June 26 and July 13, 2021, "as a direct result of being placed in a walking boot or cast." He said that it was "very unlikely that a transverse fracture would progress in an appropriately placed non-weight-bearing short leg cast or splint."

{¶ 45} When asked what he would do if a patient presented to him with a bone deformity causing a skin wound, Dr. Kabei testified that he would take measures to rule out infection. He would look for soft tissue signs such as erythema, redness, or drainage. If a bone is causing deformity of the skin, or is sticking out of the skin, he would assume there has been exposure to the air, requiring antibiotics. He would order lab tests to

16.

monitor her ESR/CRP levels, and he would take action to stabilize the fracture because instability increases the chances of long-term infection. Dr. Kabei explained that there are multiple facets to ruling out osteomyelitis, including MRI, bone scan, or CT scan, lab tests, and biopsy.

{¶ 46} During I and D procedures, Dr. Kabei may insert antibiotic beads if there's an active infection and he is trying to eradicate a local infection of the bone. This, along with IV antibiotics, will help the patient. Whether I and D is effective depends on a lot of factors, including comorbidities, the fracture pattern, skin lesions present, white blood count and ESR levels, and the blood cultures.

{¶ 47} As to Dr. Tank's initial consultation, Dr. Kabei agreed with his decision to treat Halter conservatively because of the high risk associated with surgery, place her in a short leg cast with instructions not to bear weight on it, and instruct her to follow up in three weeks. It was also reasonable on August 12, 2021, to place Halter in a CAM boot and instruct her not to bear weight.

{¶ 48} Dr. Kabei opined that to meet the standard of care at the September 23, 2021 office visit following Halter's removal of the CAM boot and discovery of the open wound, Dr. Tank should have cultured the wound, started her on a broad spectrum antibiotic, referred her to the ED for IV antibiotics (or to an infectious disease physician if one could be found immediately), and considered putting on an external fixator that day. He acknowledged that Dr. Tank scheduled Halter for follow-up and ordered labs and an MRI, however he maintained that this was not adequate. He explained that Dr. Tank

17.

should also have obtained cultures and tissue samples. In the meantime, while waiting for results, Dr. Kabei insisted that broad spectrum antibiotics should have been ordered. Dr. Kabei acknowledged that Halter saw a wound care specialist—a vascular surgeon—on September 22, 2021, who did not do a wound culture or order antibiotics, but he declined to render opinions about the appropriateness of that care because he is not a vascular surgeon.

{¶ 49} Dr. Kabei agreed that there was nothing in the record indicating that Halter was advised never to take off the boot. He could not say that Halter would have identified the skin breakdown earlier if she had been taking off the CAM boot on occasion. He opined that Halter should have been instructed to follow up with Dr. Tank every couple of weeks because of the risk of skin breakdown, her comorbidities, and suspicion that Halter may not accurately recall instructions. He cannot say when Halter's skin wound developed. He recalled that when Halter presented to the ED on September 25, 2021, she was diagnosed with sepsis.

{¶ 50} The further deformity of Halter's ankle that was observed on September 23, 2021, could have been caused by weight-bearing, but Dr. Kabei could not say how it occurred in this case. He opined that Dr. Tank's failure to start antibiotics on September 23, 2021, increased her risk of becoming septic and developing osteomyelitis. As to whether this failure caused Halter to have her lower left leg amputated, Dr. Kabei responded that the "whole situation" was a "domino effect." "[T]he dominoes started with Dr. Boggus, and I think Dr. Tank had a certain domino in the middle. All these

18.

things have added up and led to this amputation." He declined to say that Dr. Boggus's and Dr. Tank's negligence "caused" the need for amputation—he said they "contributed to it." He explained:

> Her comorbidities and her presentation was the main factor as to why she got complications, but as a physician, it's our duty to mitigate those complications. . . . [I]n Dr. Boggus's case, it's almost a lack of knowledge and lack of knowing what to look for, and in Dr. Tank's case, the delay in treatment with antibiotics, have contributed to the complications which led to the amputation.

Dr. Kabei acknowledged that the delay in administration of antibiotics was less than 48 hours, but he said a delay of even one hour was too long. He emphasized that the one-to-two-day delay in treating her infection impacted Halter's overall outcome.

{¶ 51} Dr. Kabei could not say whether Halter's leg infection was improving after the multiple I and D's performed by Dr. Tank. He would not offer opinions about whether Halter's leg could have been salvaged through ongoing care with Dr. Tank. Ultimately, the informed decision to amputate had to be made by the patient. The quicker she could become mobile again, the more it would benefit her long-term.

### F. Expert Witness Dr. David Bewster

{¶ 52} Dr. Brewster is a vascular surgeon retained by Martin. He testified that he was retained, primarily, to opine whether Halter's decision to have her leg amputated was justified or whether further attempts should have been made to salvage her leg. Dr. Brewster observed that Halter had numerous comorbidities, including hypertension, diabetes, a history of pancreatitis and alcoholism, and adrenal insufficiency. He said that this medical history, plus her massive pulmonary embolus, would put her at risk for

19.

ongoing DVT and recurrent pulmonary emboli. These risks would increase with immobilization and would have played a role in the decision to amputate her leg.

{¶ 53} Concerning Halter's initial fracture, Dr. Brewster's understanding was that it was only minimally displaced but became more displaced because she inappropriately bore weight. Within two weeks of her office visit with Dr. Boggus, she developed DVT and a massive pulmonary embolus. He said that —"no doubt about [it]"— the fracture and resulting immobility caused the development of the DVT and PE. "[I]t seems pretty inescapable." He explained that the fracture itself may also have caused direct trauma to the vein that could initiate thrombosis because "trauma and immobility often go together." Dr. Brewster agreed with Dr. Tank that it was a good decision to treat Halter's problems conservatively rather than operating, as was Dr. Boggus's proposed plan.

{¶ 54} As to the decision to amputate, Dr. Brewster recited the efforts made by Dr. Tank to clear the infection and stabilize the fracture, but he testified that his experience with osteomyelitis is that only removal of the infected bone would clear it—not antibiotics. To salvage the leg would require multiple admissions and procedures and take somewhere between six months and two years and even then may not be successful. On top of that, Halter was experiencing pain and was at continued risk for infection. He opined that it was reasonable for Halter to conclude that amputation was her best option. Dr. Brewster did not believe that it was more likely than not that her leg would have been successfully salvaged with ongoing care.

{¶ 55} Dr. Brewster clarified that he would not be rendering standard of care opinions with respect to the treatment provided by Dr. Boggus, but he reiterated that trauma combined with immobility caused the DVT. He said development of a DVT is more likely in a person who is immobile than in a person who is mobile. He specified that "immobility" means less activity than a normal person, but not 100 percent bedridden. He opined that the DVT developed sometime before July 13, 2021—he could not say when—and the pulmonary emboli developed July 12 or 13, 2021.

{¶ 56} Dr. Brewster agreed that if Halter had proceeded with surgery on July 20, 2021, as she and Dr. Boggus initially planned, she would not have developed an infection and it is more likely than not that amputation would have been unnecessary. He qualified this by saying that this would be true if "she survived the procedure despite her comorbidities and recent massive pulmonary embolus."

## G. Expert Witness Dr. Richard Laughlin

{¶ 57} Dr. Laughlin is an orthopedic surgeon retained by Dr. Tank. Dr. Laughlin agreed that Halter was a high-risk patient with numerous comorbidities, diabetes being one of the more notable of them because it can affect normal sensation in the feet. He acknowledged that Halter has vascular disease and a history of DVTs, which placed her at risk for subsequent DVTs.

{¶ 58} As to the cause of Halter's initial fracture, Dr. Laughlin agreed with Dr. Kabaei that it was likely pathological, probably precipitated by low bone density. He

21.

agreed that Halter's fibula fracture could have been caused by weight-bearing and that she was at high risk for blood clots.

{¶ 59} Dr. Laughlin explained that a walking cast is different from other types of casts in that it is a little thicker so that it will be strong enough for the patient to bear weight on it. It is intended to be weight-bearing. Even if Halter had been instructed to remain non-weight-bearing, Dr. Laughlin indicated that that would be difficult given that she lived alone, had multiple comorbidities, and probably had difficulty doing simple things in her apartment.

{¶ 60} As to Dr. Tank, Dr. Laughlin opined that he did not deviate from the standard of care because when he saw Halter in the office on September 23, 2021, she was stable, he ordered appropriate labs, and he had a plan for follow up. He explained that if a patient presented to him with a bone deformity and an open wound, he would have done an x-ray and ordered lab work. Dr. Laughlin agreed that by being exposed to air, the bone was at risk of infection, but he emphasized that the instability of the fracture posed the biggest risk here and made it more difficult to treat the open wound and infection. Halter was not showing signs of infection at her September 23, 2021 appointment. Although she was diagnosed as septic just two days later, he testified that that could have developed within 12 to 24 hours.

{¶ 61} Dr. Laughlin does not believe it was necessary to order broad-spectrum antibiotics on September 23, 2021. He indicated that it was reasonable for Dr. Tank to order the labs and MRI and schedule her back for follow up on September 27, 2021.

22.

Halter did not need to be admitted to the hospital immediately because she did not have symptoms of an infection. Dr. Laughlin does not believe that prescribing antibiotics on September 23, 2021, would have made a difference in her condition.

{¶ 62} Finally, Dr. Laughlin opined that Halter's leg was salvageable, but also said that her decision to undergo amputation was reasonable.

## H. Expert Witness Dr. David Epstein

{¶ 63} Dr. Epstein is a vascular surgeon retained by Dr. Boggus. He disagreed that Halter's comorbidities—history of pancreatitis, DVT, and diabetes—placed her at risk of experiencing recurrent DVTs or pulmonary emboli and did not believe that DVT prophylaxis was needed. Dr. Epstein interpreted the records as demonstrating that Halter was suspected to have had a history of pulmonary embolism, but he emphasized that a PE was ruled out. He observed that she had a history of a provoked DVT, but he said that this did not increase her risk for subsequent DVTs. He opined that Halter's fracture worsened because she bore weight on it. He also opined that Halter was not too sick to have undergone surgery, as proposed by Dr. Boggus, and he did not believe that surgery would have placed her at greater risk of infection or DVT.

## I. Expert Witness Dr. David Hak

{¶ 64} Dr. Hak is an orthopedic surgeon retained by Dr. Boggus. He testified that he has treated tibial breaks in the same way described by Dr. Boggus. He said that whether one calls it a "walking cast" "depends on whether or not you let them walk" on it. He said that a walking cast is no different than a non-walking cast, except that one

23.

might reinforce the heel of the cast more if it was going to be weight-bearing. An instruction not to bear weight would not typically be charted. And although not charted, Dr. Boggus testified that he told Halter not to bear weight; Halter testified that he told her she could bear weight and Dr. Hak acknowledged that a cast shoe was prescribed. Dr. Hak testified that he would have allowed the patient to bear weight because it was a transverse fracture and should have been sufficiently stable.

{¶ 65} Concerning the need for a DVT prophylaxis, Dr. Hak said it would depend on how the patient presented. A patient with prior PEs or DVTs could be at high risk for subsequent PEs and DVTs but it would "depend upon the individual circumstances." He did not think that Halter was at very high risk because she suffered only a nondisplaced fracture of the distal tibia.

{¶ 66} Dr. Hak would not characterize Halter's fracture as pathological, but acknowledged that some would just based on some underlying degree of osteoporosis. He did not believe that Dr. Boggus should have removed the splint when he first examined her.

{¶ 67} Dr. Hak does not know how Halter sustained the second fracture, but he said that weight-bearing itself would not be expected to cause a fracture. He does not know how the DVTs developed. He believes that Dr. Boggus's exam as described in his deposition was consistent with the standard of care. He was not critical of Dr. Boggus's charting. He agreed that the physician—not the scribe—is responsible for what gets charted.

24.

{¶ 68} With respect to Dr. Kabaei's opinion that DVT prophylaxis would have decreased the risk of developing pulmonary emboli, Dr. Hak stated that "in general, we believe that DVT prophylaxis decreases the rate of DVTs leading to pulmonary emboli," but "[w]hether or not it would have made a difference in this circumstance, I don't know that I can opine, just because it's unique nature of a nondisplaced fracture." He does not believe that Halter should have been prescribed DVT prophylaxis. He does not believe that Dr. Boggus deviated from the standard of care.

{¶ 69} Finally, Dr. Hak agreed that untreated diabetics are more prone to open wounds and deformities.

### J.  The Motions for Summary Judgment

Both Dr. Boggus and Dr. Tank filed motions for summary judgment. We summarize their arguments separately.

### 1.  Dr. Boggus

{¶ 70} Dr. Boggus argued that Martin's experts "failed to establish that any alleged breach of the standard of care by Dr. Boggus proximately caused Ms. Halter to lose her leg or any other injury," thus summary judgment should be granted. He addressed the testimony of Martin's two experts.

{¶ 71} As to Dr. Brewster, Martin's expert vascular surgeon, he testified that he would not offer any opinion that Dr. Boggus deviated from the standard of care or that Halter needed to be placed on medications to reduce her risk of developing a DVT. Dr. Boggus contended that Dr. Brewster's opinions were limited to whether it was reasonable

25.

for Halter to opt to have her leg amputated. Dr. Boggus acknowledged that Dr. Brewster opined that Halter's fall and immobility led to the DVT, but he claimed that Dr. Brewster could not say which specific event led to the DVT or when Halter developed the DVT. He maintained that Dr. Brewster was unable to say how Halter's risk of developing a DVT would have been different had she remained non-weight-bearing instead of weight-bearing. And Dr. Boggus emphasized that Dr. Brewster agreed that if Halter had proceeded with surgery as she and Dr. Boggus initially planned, she would not have developed an infection and, if she survived the surgery "despite her comorbidities and recent massive pulmonary embolus," it is more likely than not that amputation would have been unnecessary.

{¶ 72} As to Dr. Kabaei, Dr. Boggus acknowledged Dr. Kabaei's opinion that he deviated from the standard of care, but Dr. Boggus claimed that Dr. Kabaei's opinions were speculative or did not demonstrate proximate cause.

{¶ 73} First, Dr. Boggus stated that Dr. Kabaei could not identify the cause of the original fracture, but stated only that it was "possible" that it was pathologic. Second, Dr. Boggus pointed out that while Dr. Kabaei was critical that he did not instruct Halter to remain non-weight-bearing, Dr. Kabaei admitted that he does not know one way or another whether Dr. Boggus instructed Halter to remain weight-bearing—he just knew that Dr. Boggus did not chart the instruction. Third, Dr. Boggus emphasized that Dr. Kabaei said only that Dr. Boggus should have "considered" placing Halter on DVT prophylaxis, but he could not say when the DVT occurred or what caused it, and he could

26.

not say—to a reasonable degree of medical probability—that a DVT prophylactic medication would have prevented the development or propagation of the DVT, or that the pulmonary emboli and other resulting complications would have been avoided. He said only that it was "possible" that she would not have had the DVT if she had been given prophylactic medication. Fourth, Dr. Boggus argued that Dr. Kabaei could not say what Dr. Boggus would have found if he had removed the splint on June 30, 2021, and given that Dr. Tank noted no skin changes when Halter's splint was removed on July 20, 2021, it is clear—and Dr. Kabaei admitted—that the course of Halter's care would not have been different if Dr. Boggus had examined her skin at the office visit. Finally, Dr. Kabaei opined only that Dr. Boggus and Tank's care "contributed to" the need for amputation, but did not cause the injury. As such, Dr. Boggus contended that Dr. Kabaei could not say that Dr. Boggus's negligent care "proximately caused Ms. Halter's complications or lower leg amputation."

{¶ 74} Martin responded that genuine issues of material fact prevented summary judgment. Specifically, she pointed to numerous instances where Dr. Boggus's charting conflicted with his deposition testimony, creating factual disputes. One particular fact that is disputed is whether Dr. Boggus told Halter not to bear weight. Martin insisted that the conflicts in the chart—the walking cast versus a splint wrapped in fiberglass, weight-bearing versus non-weight-bearing, etc.—and the failure to chart certain observations—pulses in Halter's toes, neurovascular status, range of motion, etc.—support her claim that Dr. Boggus deviated from the standard of care in evaluating and treating her injury.

27.

To the extent that Dr. Boggus testified to contrary facts or uncharted care, she argued that those facts must be construed in her favor.

{¶ 75} Martin also highlighted Dr. Kabaei's testimony that (1) it was imperative that Dr. Boggus remove the cast or splint and examine the soft tissue, which he admittedly did not do, and (2) that Dr. Boggus did not address Halter's risk for forming blood clots and ensuring that DVT prophylactics were prescribed. By failing to do so, he testified, "the dominoes ha[d] fallen," leading to severe blood clots and significantly increasing her risk of further complications.

{¶ 76} Martin clarified that the cause of Halter's first fall has never been at issue, despite Dr. Boggus's insinuation to the contrary—it is the care she received after sustaining that fall. Martin maintained that how or when she developed the DVT is also largely irrelevant. She claimed that Dr. Boggus glossed over "the fundamental role that placing a tibia in a walking cast played in her subsequent course." Martin insisted that Dr. Boggus's reliance on Dr. Brewster's testimony was unfounded given that he is a vascular surgeon and deferred to the standard-of-care and causation opinions of the orthopedic experts.

{¶ 77} In reply to Martin's arguments, Dr. Boggus emphasized Dr. Kabaei's testimony that (1) he did not think that the failure to remove the splint at the first visit would have altered the course of Halter's care, (2) he did not know when the DVT and pulmonary emboli developed, and (3) the primary causes of Halter's complications were

28.

her comorbidities and presentation.  Dr. Boggus characterized Dr. Kabaei's standard-of-care opinions as being critical of Dr. Boggus's charting—not of Dr. Boggus's care.

{¶ 78} In surreply, Martin denied that Dr. Kabaei's criticisms were limited to Dr. Boggus's charting.  She also pointed out that Dr. Kabaei stated clearly in his affidavit of merit that it was his opinion that Dr. Boggus breached the standard of care and proximately caused injury to Halter.  She complained that Dr. Kabaei "was not asked about [his affidavit] once" during his deposition.

## 2. Dr. Tank

{¶ 79} Dr. Tank argued that Martin's criticisms of his care revolve around Halter's office visit with him on September 23, 2021.  He pointed out that Dr. Brewster provided no standard-of-care testimony and testified that Halter's decision to proceed with amputation was reasonable—he did not testify that Dr. Tank's care caused the need for amputation.  Dr. Tank acknowledged, however, that Dr. Kabaei testified that he breached the standard of care by failing to culture the wound, start Halter on broad spectrum antibiotics, and refer Halter to the ED or an infectious disease specialist.  Dr. Tank insisted, however, that Dr. Kabaei did not testify that these alleged breaches proximately caused Halter to have her lower left leg amputated—he stated only that it "contributed to it."  In fact, "[h]er comorbidities and her presentation was the main factor as to why she got complications."

{¶ 80} Martin responded that Dr. Kabaei opined that it was incumbent on Dr. Tank to immediately prescribe antibiotics upon seeing Halter on September 23, 2021, to culture

29.

the wound, and to immediately refer her to the ED or an infectious disease specialist. Dr. Kabaei identified this inaction as one of the "dominoes" that led to Halter's amputation. She highlighted Dr. Laughlin's testimony where he agreed that the purulence observed deep in Halter's wound and the instability of her fracture were part of an evolving process and had a "domino effect." She also observed that Dr. Laughlin had stated that diabetics with neuropathy often get bone deformities causing skin wounds and that this is something that should have been anticipated.

{¶ 81} Dr. Tank replied that Dr. Laughlin clearly opined that the prescribing of broad spectrum antibiotics would not have been appropriate on September 23, 2021, and—to a reasonable degree of medical probability—would not have altered the ultimate course of Halter's condition. He maintained that even Dr. Kabaei could say only that the delay in prescribing antibiotics increased Halter's chances of becoming septic and developing a bone infection. He emphasized Dr. Kabaei's testimony that it was Halter's comorbidities and presentation that led to her complications and ultimate amputation. Dr. Tank also questioned Halter's choice to have her leg amputated while he was effectively treating her infection.

{¶ 82} In surreply, Martin, in large part, reiterated her previous arguments and accused Dr. Tank of "spinning" the testimony. She described Dr. Kabaei's opinions as nuanced, but still supportive of deviations from the standard of care and proximate cause.

30.

## K. The Trial Court Judgment

{¶ 83} The trial court granted summary judgment in favor of Drs. Boggus and Tank. As to Dr. Boggus, the court recognized that Martin presented opinions that he was negligent for failing to instruct Halter to stay off of her injured leg, however, it was persuaded that Martin failed to produce expert evidence to support her claim that Halter developed deep vein thrombosis and other complications as the proximate result of Dr. Boggus's actions or inaction. It acknowledged that Dr. Brewster had opined that Halter's fall and immobility led to her DVT, but it emphasized that Dr. Brewster was unable to pinpoint when the DVT developed and could not opine concerning the risk that a similarly-situated patient would develop a DVT if he or she bore weight on the fractured leg. As such, the court concluded, "Brewster's testimony fails to establish that Boggus' alleged failure to instruct Plaintiff to stay off her leg proximately caused Plaintiff to develop a DVT."

{¶ 84} The court also concluded that Dr. Kabaei's opinions were speculative and failed to establish that Dr. Boggus's actions proximately caused harm to Halter. It observed that (1) Dr. Kabaei was unable to opine to a reasonable degree of medical probability that the tibial fracture was caused by a mechanism other than Halter's fall; (2) he could not offer an opinion as to whether a successful surgery would have prevented Halter's other complications occasioned by the progression of her fracture; (3) Dr. Kabaei did not know whether Dr. Boggus, in fact, talked to Halter about remaining non-weightbearing and could only say that a conversation between Dr. Boggus and Halter was

31.

not documented; (4) although he said there were a few notes describing that Halter was walking in a cast as prescribed, Dr. Kabaei was unaware of evidence indicating that Halter had been essentially bedridden from June 30 to July 13, 2021, and did not recall seeing a July 13, 2021 hospital notation reflecting that she had been fairly immobilized since the time of her fall; (5) Dr. Kabaei could not state to a reasonable medical probability what caused Halter's DVTs, when they occurred, or whether a DVT prophylaxis would have prevented their development or propagation, the resulting bilateral pulmonary emboli, and complications; (6) Dr. Kabaei specifically denied that he was offering opinions regarding the cause of the DVTs in Halter's lower left leg and could only say that the risk of developing a DVT would have been reduced had she been started on a prophylaxis; (7) despite his opinion that the standard of care required Dr. Boggus to remove Halter's splint on July 14, 2021, so he could examine her leg, Dr. Kabei could not say what Dr. Boggus would have found had he removed the splint, there were no skin changes on July 20, 2021, when Dr. Tank removed the splint, and he admitted that the failure to remove the splint did not alter the course of Halter's care.

{¶ 85} In sum, the Court agreed with Dr. Boggus that Dr. Kabei's testimony "fail[ed] to establish the required proximate cause between Dr. Boggus' inaction and any injury to Plaintiff."

{¶ 86} As to Dr. Tank, the court agreed with Dr. Tank that Dr. Brewster's testimony did not establish a breach of the applicable standard of care or that Dr. Tank's actions or inaction proximately caused Halter's injury. The court observed that Dr.

32.

Kabaei's criticisms focused on Halter's September 23, 2021 office visit, which occurred after Halter discovered her ankle wound. The court found that while Dr. Kabaei opined that Dr. Tank breached the standard of care by failing to culture the wound, immediately start Halter on a broad-spectrum antibiotic, or refer her to a local emergency room or an infectious disease physician who could see her immediately, Dr. Kabaei's testimony failed to establish that the cited breaches proximately caused Halter to have her leg amputated.

{¶ 87} The trial court cited Dr. Kabei's deposition testimony:

> Q: Okay. So you are going to be testifying at trial that both Dr. Boggus's negligence and Dr. Tank's negligence in caring for this patient, [Plaintiff] Patricia Halter, proximately caused her to have her lower left leg amputation; is that right?
>
> A: I wouldn't say it caused it. They contributed to it. Her comorbidities and her presentation was the main factor as to why she got complications. . . .

{¶ 88} The court rejected Halter's position that the following excerpt demonstrates that Dr. Kabei's testimony was more "nuanced" than Dr. Tank's suggested interpretation:

> Q: Will you be offering an opinion as to whether Dr. Tank's negligence on September 23rd proximately caused [Plaintiff] Ms. Halter to have her lower left leg amputated?
>
> A: That's a good question. This whole situation with Ms. Halter is a domino effect and you're asking me if the first domino affected the last domino. Yes. I think the dominoes started with Dr. Boggus, and I think Dr. Tank had a certain domino in the middle. All these things have added up and led to the amputation.

{¶ 89} The court concluded that this testimony was vague and only suggested that the actions by the two doctors combined with Halter's co-morbidities and presentation to

33.

cause Halter's injury. It concluded that the testimony "lacked the required indication of medical probability that any breach of the standard of care on Dr. Tank's part more likely than not led to Plaintiff's amputation."

{¶ 90} The court rejected Martin's argument that Dr. Laughlin—Dr. Tank's own expert—supported her position because he agreed generally that a person with an open wound and a bone infection should get medical treatment, including antibiotics. It found that despite Dr. Laughlin's agreement on this point, his testimony did not establish a breach of the standard of care or proximate cause given that Dr. Laughlin "unequivocally denied any belief that Tank had made any deviation from the standard of care" and "further opin[ed] to a reasonable degree of medical certainty that Plaintiff's outcome 'would not have been a lot different' had Tank in fact started her on antibiotics on September 23, 2021."

{¶ 91} As such, the court concluded that Halter failed to establish a prima facie claim of medical negligence against Dr. Tank.

{¶ 92} Martin appealed. She assigns the following error for our review:

THE TRIAL COURT ERRED IN GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT.

## II. Standard of Review

{¶ 93} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129 (9th Dist. 1989). The motion may be granted only when it is demonstrated:

34.

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 94} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist. 1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist. 1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### III. Law and Analysis

{¶ 95} In her sole assignment of error, Martin argues that the trial court erred when it granted summary judgment in favor of Drs. Boggus and Tank. She maintains that when viewed in their entirety, the opinions expressed by Dr. Kabei demonstrate a clear causal link between the doctors' breaches of the standard of care and Halter's injuries. Martin emphasizes that Dr. Kabaei was not required to express his opinions with

35.

"certainty" and maintains that Dr. Kabei rendered opinions that breaches of the standard of care more likely than not caused Halter's injuries—i.e. the natural and continuous sequence of the defendants' acts produced a result that would not have otherwise taken place. She also complains that the trial court resolved credibility determinations in the physicians' favor instead of allowing a jury to make those determinations.

{¶ 96} "To establish a claim of medical malpractice, a plaintiff must prove by expert testimony the applicable standard of care, a breach of that standard of care, and that the breach was a proximate cause of the injuries alleged." *Hitch v. Thomas*, 2010-Ohio-3630 (6th Dist.). Summary judgment in favor of the defendant-physician is appropriate where "the plaintiff fails to present expert testimony that [the] physician breached the applicable standard of care and that the breach constituted the direct and proximate cause of the plaintiff's injury. . . ." (Internal quotations and citations omitted.) *Culp v. Olukoga*, 2013-Ohio-5211, ¶ 70 (4th Dist.). "The rule of proximate cause requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." (Internal quotations omitted.) *Jenkins v. Grawe*, 2019-Ohio-2013, ¶ 16 (10th Dist.), quoting *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143 (1989), quoting *Ross v. Nutt*, 177 Ohio St. 113, 114 (1964).

{¶ 97} As the trial court did, we separately address the arguments as they relate to each doctor. But before doing so, we note that Martin argues that "[t]here is no genuine

36.

question that Dr. Kabaei's opinion as stated in his Affidavit of Merit and deposition testimony meets the necessary threshold for establishing a prima facie case." It is true that Dr. Kabaei's affidavit of merit contains a clear statement that Dr. Boggus and Dr. Tank breached the standard of care and their breaches proximately caused Halter's injuries. However, "[a]n affidavit of merit that only includes the necessary assertions under Civ.R. 10(D)(2)(a) does not constitute evidence for consideration on summary judgment." *Schumacher v. Patel*, 2023-Ohio-4623, ¶ 23 (10th Dist.), citing Civ.R. 10(D)(2)(d) ("An affidavit of merit is required to establish the adequacy of the complaint and shall not otherwise be admissible as evidence."). Dr. Kabaei's affidavit of merit contains only the necessary assertions. Accordingly, in resolving Martin's assignment of error as to each physician, we will not consider Dr. Kabaei's affidavit of merit.

## A. Dr. Boggus

{¶ 98} Martin argues that "despite the trial court's apparent lack of understanding," Dr. Kabaei expressed clear opinions that Dr. Boggus deviated from the standard of care, proximately resulting in Halter's injuries. She also complains that the trial court resolved credibility determinations in Dr. Boggus's favor. Martin maintains that any alleged vagueness in Dr. Kabaei's opinions goes to the weight of his testimony, rather than its admissibility. She insists that if the trial court had construed permissible inferences and resolved questions of credibility in her favor, as it was required to do, it could not have granted summary judgment to Dr. Boggus.

37.

{¶ 99} Dr. Boggus responds that Dr. Kabaei's opinion testimony "was riddled with speculative possibilities," and ultimately revealed that Dr. Kabaei believed that the negligence of the physicians merely "contributed to"—rather than "caused"—the condition resulting in amputation. He maintains that (1) Dr. Kabaei was unable to opine, to a medical probability, that the fracture was caused by a mechanism other than Halter's fall; (2) Dr. Kabaei admitted that he does not know whether or not Dr. Boggus told Halter to remain non-weight bearing; (3) Dr. Kabaei was unable to state, to a medical probability, what caused Halter's DVTs or when they occurred, and could not state, to a medical probability, that administration of a DVT prophylaxis would have prevented Halter from developing or propagating a DVT, developing pulmonary emboli, and experiencing other complications; (4) Dr. Kabaei admitted that if Dr. Boggus had removed the cast when he saw her, it would not have altered the course of her care; and (5) Dr. Kabaei testified that Halter's "comorbidities" and "presentation" were the cause of the complications that led to the amputation. Dr. Boggus denies that the trial court weighed the credibility of Dr. Kabaei's testimony.

{¶ 100} We have reviewed Dr. Kabaei's deposition in depth. He identified numerous breaches of the standard of care by Dr. Boggus. For most of those breaches, Dr. Boggus is correct that Dr. Kabaei was unable to establish a causal link between Dr. Boggus's conduct and Halter's injuries.

{¶ 101} First, Dr. Kabaei testified that Dr. Boggus failed to recognize that Halter suffered a "pathological atypical distal third transverse tibial fracture" that required

38.

further investigation and not merely treatment with a walking boot or cast. But when asked if he had an opinion to a reasonable degree of medical probability as to the cause of the fracture, Dr. Kabaei said that he could not say because no CT or MRI was performed to identify another etiology. He also conceded that it was only a possibility—not a medical probability—that the fracture was the result of a stress fracture and not a fall.

{¶ 102} Second, Dr. Kabaei testified that Dr. Boggus violated the standard of care on June 30, 2021, by failing to remove the splint that was placed in the ED. He testified that there could have been an open wound, material in the splint, pressure points, or a deformity that were missed by the emergency-room personnel. He testified, however, that he would have no idea what would have been revealed if the splint had actually been removed.

{¶ 103} Third, Dr. Kabaei was critical that Dr. Boggus did not remove Halter's cast or splint when he saw her at the hospital on July 13, 2021, to check for problems with her skin or soft tissue. He admitted, however, that Dr. Tank removed the cast or splint seven days later and observed no skin or soft tissue problems, and as such, this deviation from the standard of care did not alter the course of treatment.

{¶ 104} Fourth, Dr. Kabaei testified that Dr. Boggus breached the standard of care by failing to start Halter on a DVT prophylaxis when he saw her on June 30, 2021. He explained that Halter's comorbidities required Dr. Boggus to either prescribe medication or immediately refer her to another physician to consider a prophylaxis. He clarified that

39.

most people who sustain a nondisplaced tibia fracture would not require a DVT prophylactic, but Halter did because of her significant risk factors.

{¶ 105} Problematically, however, Dr. Kabaei could only say that a prophylactic would have significantly reduced the risk of blood clots and "may have" prevented the pulmonary emboli. He could not say whether Halter would have gone on to develop DVTs if she had been prescribed a DVT prophylactic—just that it would have lowered the chances. Later he said that it was "possible" that she would not have developed the DVT, pulmonary emboli, and blood clots had she been prescribed a prophylactic. But at no time did Dr. Kabaei render this opinion to a reasonable degree of medical probability or say that it was more likely than not that these complications would have been avoided.

{¶ 106} We addressed a similar issue in *Harris-Miles v. Lakewood Hosp.,* 2018-Ohio-664, ¶ 22 (6th Dist.), where we held that plaintiff's expert's testimony was not competent because he could say only that the administration of a steroid would have reduced the risk of alveolar stroke but could not say to a reasonable degree of medical probability that it would have prevented it. Absent testimony demonstrating this degree of certainty—more than 50 percent likelihood—Dr. Kabaei's opinions about the failure to prescribe a DVT prophylactic are simply not sufficient to support causation and defeat summary judgment.

{¶ 107} Fifth, Dr. Kabaei opined that Dr. Boggus deviated from the standard of care by failing to review Halter's records from the ED. Causation was not specifically addressed relating to this deviation, other than that a review of the medical records would

40.

have made clear that Halter had significant risk factors for blood clots. But as previously noted, Dr. Kabaei's testimony fell short of demonstrating that recognition—and even treatment—of these risk factors would have changed the outcome here.

{¶ 108} Sixth, Dr. Kabaei testified that Dr. Boggus's care fell below the applicable standard because he failed to conduct a neurovascular exam, which would have included inspection and palpation of the extremity and evaluation of the condition of the soft tissue, sensation, reflexes, and range of motion. He conceded that he did not know that aspects of this exam were not performed, but he said that if they were, they were not documented. But again, causation was not addressed with respect to the failure to either perform or document this examination, so this opinion is not sufficient to defeat summary judgment.

{¶ 109} This leads to one final criticism.

{¶ 110} Dr. Kabaei testified that Dr. Boggus breached the standard of care by failing to instruct Halter to remain non-weight-bearing. Dr. Boggus suggests that because Dr. Kabaei does not know whether Dr. Boggus instructed Halter with respect to weight-bearing—Dr. Boggus claims he did—he cannot say that Dr. Boggus violated the standard of care.

{¶ 111} There was conflicting evidence whether Dr. Boggus instructed Halter not to bear weight. Martin testified that Dr. Boggus placed Halter in a walking cast, they were instructed to go to the medical supply store to get a shoe to put over the cast so Halter could walk on it, and Martin believed that Dr. Boggus said that Halter could walk

41.

on her left leg immediately, which was why they got the cast shoe right away. The experts' depositions indicate that in the chart, the cast is described as a "walking cast," and Dr. Boggus's instructions with respect to weight-bearing were not charted. Importantly, Dr. Boggus did not specifically recall his encounter with Halter, so his testimony assumes that he followed his usual practice of instructing his patients about weight-bearing. We conclude that whether Halter was instructed that she could bear weight is a disputed issue of fact that must be resolved by the jury. *See, e.g., Heath v. Teich,* 2004-Ohio-3389, ¶ 11 (10th Dist.) (concluding that issue of fact precluded directed verdict where defendant testified that he considered but ruled out cardiac tamponade, but plaintiff's expert testified that there was no evidence of this in the medical record and this was something that would normally be included in the medical record).

{¶ 112} Dr. Kabaei made clear that to the extent that Dr. Boggus instructed Halter that she could bear weight on her leg, this violated the standard of care. This brings us to the issue of causation—i.e., whether the alleged failure to instruct Halter to remain non-weight-bearing caused injury to Halter. Although never acknowledged or addressed by the trial court, Dr. Kabaei testified that the displacement of Halter's fracture, which occurred sometime between June 26 and July 13, 2021, was the "direct result" of walking in a walking boot or cast, and it was unlikely that she would have sustained the progression of her initial fracture if she had been non-weight-bearing:

> Q: [W]ill you offer an opinion at trial as to why Ms. Halter's tibial fracture progressed and fibular fracture evidenced itself between the x-ray taken on June 26th and when she presented to a hospital on July 13th?

42.

A: Yes.

Q: What is that opinion?

A: I think that her fracture displaced as a direct result of being placed in a walking boot or cast.

Q: Was it the placement in that device or was it the fact that she was walking while in it?

A: The fact that she was walking while in it.

Q: Okay. You gave some testimony earlier about the tendon and muscular impact in contracting on the fracture site. If Ms. Halter had not been bearing weight from the time she saw Dr. Boggus until she presented to the hospital on July 17th (sic), could she still have had progression of her fracture?

A: Barring any mechanical falls, it's very unlikely that a transverse fracture would progress in an appropriately placed non-weight bearing short leg cast or splint.

Dr. Kabaei conceded that he could not rule out that Halter had fallen again during this time period, but we are aware of no evidence that Halter experienced a fall during that time.

{¶ 113} When inquiring on this topic, defense counsel did not ask Dr. Kabaei whether he held this opinion to a reasonable degree of medical probability. "In Ohio, an expert's testimony concerning proximate cause is admissible only where his or her opinions as to the causative event are expressed in terms of probability." *Harris-Miles*, 2018-Ohio-664, at ¶ 17 (6th Dist.), citing *Stinson v. England*, 69 Ohio St.3d 451, 455 (1994). "'[A]n event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue.'" *Id.,* quoting *id.* "'If an expert testifying as to

43.

causation fails to testify in terms of probability, the expert's testimony is incompetent.'" *Id.,* quoting *Steinmetz v. Latva,* 2003-Ohio-3455, ¶ 21 (6th Dist.).

{¶ 114} But Ohio courts also recognize that an expert need not "utter any magic words" to demonstrate probability. *See, e.g., Kittis v. Cleveland Clinic Found.,* 2024-Ohio-659, ¶ 18 (8th Dist.); *Blair v. McDonagh,* 2008-Ohio-3698, ¶ 27 (1st Dist.); *Coe v. Young,* 145 Ohio App.3d 499, 504 (11th Dist. 2001). Rather, when considered in its entirety, the expert's testimony must be equivalent to an expression of probability. *See Kittis* at *id.*; *Jeffrey v. Marietta Mem. Hosp.,* 2013-Ohio-1055, ¶ 48 (10th Dist.).

{¶ 115} In *Kaplan v. Hammond,* 2024-Ohio-2492, ¶ 48 (6th Dist.), for instance, we found that an expert's report provided sufficient detail to establish his conclusions with respect to breach of duty and causation, even though he did not explicitly state that he held his opinions to a reasonable degree of probability. Like the cases cited above, we found that "magic words" were unnecessary and the expert's conclusions must be considered in their entirety. *See also Brondes Ford, Inc. v. Habitec Sec.,* 2015-Ohio-2441, ¶ 136 (6th Dist.).

{¶ 116} Here, Dr. Kabaei unequivocally stated that the displacement of Halter's fracture was the "direct result" of walking in a walking cast. When his testimony is read in its entirety, we conclude that Dr. Kabaei's testimony that the displacement of Halter's fracture was caused by bearing weight in the walking cast was stated to a sufficient degree of probability to support proximate causation. This is in contrast to the other

44.

opinions described above, where Dr. Kabaei was forthcoming in admitting that he could not correlate breaches of care with the harm that resulted.

{¶ 117} Because Dr. Kabaei offered admissible opinions that Dr. Boggus's alleged failure to instruct Halter to remain non-weight-bearing—a genuine issue of material fact—caused injury to Halter—displacement of her fracture—we conclude that the trial court erred in granting summary judgment to Dr. Boggus.

{¶ 118} We find Martin's assignment of error well-taken with respect to the trial court's decision to grant summary judgment to Dr. Boggus and his employer, Toledo Clinic.

### B. Dr. Tank

{¶ 119} Martin's criticisms of Dr. Tank's care revolve around Halter's office visit on September 23. 2021, when Halter presented to him after discovering the open sore and deformity under the CAM boot. Dr. Tank ordered labs and an MRI and scheduled a follow-up appointment for September 27, 2021. Martin argues that the standard of care required Dr. Tank to immediately start Halter on a broad-spectrum antibiotic to begin treating what was obviously an infection, immediately refer her to the ED or an infectious disease specialist, and consider putting on an external fixator that day so that the infection would not worsen.

{¶ 120} As Martin argues, Dr. Kabaei did, in fact, testify that a 48-hour delay in treating Halter with antibiotics—and even a one-hour delay—was too long. He explained, "[w]hen you have someone with exposed bone, you want to infuse antibiotics

45.

immediately. I can't see any situation where a physician would see a patient with an open wound, with bone exposed, and then discharge[] that patient out of their office without starting antibiotics. I just don't see any situation that that can happen."

{¶ 121} But Dr. Kabaei testified that the progression of Halter's condition, which ultimately led to the amputation of her leg, was not "caused by" Dr. Tank's negligent care. He said that Halter's comorbidities and presentation caused her complications, but the doctors' negligence "contributed to it." Martin, on the other hand, emphasizes that Dr. Kabaei described that this situation produced a domino effect. "[T]he dominoes started with Dr. Boggus, and I think Dr. Tank had a certain domino in the middle. All these things have added up and led to this amputation."

{¶ 122} "[T]wo factors can combine to produce damage or illness, each being considered a proximate cause of the injury." *Celmer v. Rodgers*, 2005-Ohio-7054, ¶ 37 (11th Dist.), *Norris v. Babcock & Wilcox Co.*, 48 Ohio App.3d 66, 67 (9th Dist. 1988). Nevertheless, a plaintiff in a medical malpractice action "must prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Roberts v. Ohio Permanente Med. Group, Inc.,* 76 Ohio St.3d 483, 485 (1996). Given that "numerous causes, including but not limited to a physician's negligence, may have contributed to a plaintiff's injury," "[a]n opinion based on probability is necessary to express whether the injury was more likely than not caused by the physician's breach of the standard of care." *Toth v. Oberlin Clinic, Inc.,* 2002-Ohio-2211, ¶ 13 (9th Dist.).

46.

{¶ 123} Here, Dr. Kabaei did not state that it was more likely than not that Dr. Tank's failure to immediately prescribe antibiotics caused Halter's injury. In fact, when asked directly if Dr. Tank's negligence proximately caused the need for amputation, he said "I wouldn't say it caused it." *See Highley by Highley v. Stewart & Turman, M.D.'s, Inc.,* 1993 WL 265492, *2 (12th Dist. July 19, 1993) (concluding that physicians' statement that defendants' acts "contributed to" the patient's injuries was "simply insufficient to demonstrate proximate causation" because "[a] failure of due care may 'contribute to' an injury in some minimal way, yet not constitute a direct proximate cause of that injury."). And unlike Dr. Kabaei's testimony concerning Dr. Boggus's alleged failure to instruct Halter to remain non-weight-bearing being the direct cause of the displacement of Halter's fracture, when read in its entirety, we cannot interpret his testimony as establishing that it was more probable than not that Dr. Tank's actions or inactions proximately caused Halter's injury.

{¶ 124} Martin likely did not expect her causation expert to testify that the defendants' care did not cause Halter's injuries. However, when faced with this presumably unanticipated testimony, it was incumbent on Martin to clarify Dr. Kabaei's testimony and rehabilitate him if clarification and rehabilitation were possible. *See Frost v. Evenflo Co., Inc.,* 2023-Ohio-4561, ¶ 111 (2d Dist.) (recognizing that attorneys who retain expert witnesses "do not represent experts," but "often act as if they do, by objecting and rehabilitating the expert if needed, or if dissatisfied, clarifying depositions on the record"). Martin cannot rely on Dr. Kabaei's affidavit of merit to render his

47.

testimony competent or ask this court to make a strained interpretation of his testimony to arrive at an outcome favorable to her position.

{¶ 125} As for the cases cited by Martin to support her claim that an expert's "vagueness" goes to the weight of the testimony—not its admissibility—we find those cases distinguishable because in all of them, the experts first testified that the physicians' conduct proximately caused the patient's injuries. *See Kittis,* 2024-Ohio-659, ¶ 27 (8th Dist.) (plaintiff's expert was unable to opine to a reasonable degree of medical probability whether the decedent's bowel ischemia was caused by torsion, a blood clot, or venous obstruction, but "[he] did testify, to a reasonable degree of medical probability, that the [defendant's] failure to recognize [the decedent's] symptoms was the proximate cause of his injuries and death"); *Vactor v. Franklin Blvd. Nursing Home, Inc.,* 2021-Ohio-945, ¶ 30-31 (8th Dist.) (although plaintiff's causation expert could not identify the decedent's cause of death, he responded "yes" when asked whether it was "more likely than not . . . that . . . had she been transferred to an acute hospital setting in a timely manner . . . the decedent would have likely had a successful outcome," and he testified "'delay in care and in getting her transferred to the ER more likely than not caused her death'"); *Heath v. Teich,* 2004-Ohio-3389, ¶ 15 (10th Dist.) (plaintiff's expert testified on cross-examination that he did not believe that it was possible to predict whether a pericardiocentesis would have prevented her death, but had first testified on direct that within a reasonable degree of medical certainty, failure to ascertain cardiac tamponade and perform a pericardiocentesis proximately caused the decedent's death). *See also*

48.

*Jones v. Birney,* 2008-Ohio-2250, ¶ 22 (9th Dist.); *Lucsik v. Kosdrosky,* 2017-Ohio-96, ¶ 16 (8th Dist.); *Miller v. MetroHealth Med. Ctr.,* 2017-Ohio-653, ¶ 26 (8th Dist.).

{¶ 126} Accordingly, with respect to the trial court's decision to grant summary judgment to Dr. Tank and his employer, ProMedica Central Physicians, we find Martin's assignment of error not well-taken.

## IV. Conclusion

{¶ 127} We find Martin's assignment of error well-taken, in part, and not well-taken, in part. When his deposition transcript is read in its entirety, Dr. Kabaei testified to a reasonable degree of probability that the displacement of Halter's fracture was proximately caused by her bearing weight on her injured leg. Given that Dr. Boggus testified that he instructed Halter not to bear weight, Martin testified that Dr. Boggus told Halter she could bear weight immediately, Halter was given a prescription for a cast shoe, and the chart refers to the cast as a "walking cast," we find a genuine issue of material fact whether Dr. Boggus advised Halter that she could bear weight on her leg. The trial court erred when it granted summary judgment to Dr. Boggus and Toledo Clinic.

{¶ 128} As to Dr. Tank's failure to prescribe a broad-spectrum antibiotic for Halter on September 23, 2021, no expert testified to a reasonable degree of probability that this failure proximately caused Halter's injuries. The trial court did not err when it granted summary judgment to Dr. Tank and ProMedica.

{¶ 129} We affirm, in part, and reverse, in part, the November 12, 2024 judgment of the Lucas County Court of Common Pleas. We remand this matter to the trial court for

49.

proceedings consistent with this decision. Martin and Dr. Boggus and Toledo Clinic are ordered to share the costs of this appeal under App.R. 24.

Judgment affirmed, in part,<br>
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____
                     JUDGE

Gene A. Zmuda, J.
_____
                     JUDGE

Myron C. Duhart, J.
CONCUR.
                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.